**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

SALLY ORR, individually and on behalf of
all others similarly situated,

         Plaintiff,

    vs.

SUNOCO LP, a Delaware limited partnership;
and DOES 1 through 25, inclusive,

         Defendants.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE**
**CALIFORNIA TRAP AND TRACE LAW**
**CAL. PENAL CODE § 638.51**

**INTRODUCTION**

1.      Defendant Sunoco LP, ("Defendant" or "Sunoco") uses data broker software on its website – https://www.sunoco.com/ (the "Website") – to secretly collect data about a Website visitor's computer, location, and browsing habits. The data broker software then compiles this data, and correlates it with extensive external records the data broker already has about most Californians, for the purpose of learning the identity of the Website visitor.

2.      Defendant's installation and use of data broker software without obtaining consent is a violation of the California Trap and Trace Law.

**JURISDICTION AND VENUE**

3.      This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

4. Defendant is an energy company that distributes and refines energy from various sources including oil and natural gas around the country, operates tens of thousands of miles of pipelines around the country, sells gasoline through retail fuel locations, and operates convenience stores. Defendant conducts substantial, continuous, and systematic business operations within California. Defendant actively markets its energy infrastructure and products to California entities and maintains ongoing business relationships with California customers. Defendant derives substantial revenue from California-based transactions, including from the multiple retail gas stations it operates within California. Defendant deliberately avails itself of the privilege of operating in California through its interactive Website which it specifically targeted towards Californians by advertising jobs available in California, shipping company gear and merchandise directly to California, and allowing customers in California to pay their bills online through the Website. Defendant also has the technical ability to

5. This Court possesses general jurisdiction over Defendant because Defendant's principal place of business and headquarters are in Dallas, Texas.

6. Defendant specifically intended its surveillance operations to cause injury to California residents. Defendant configured its tracking systems on its Website to identify, profile, and exploit California users.

7. Defendant's purposeful direction of its surveillance activities at California residents through its own Website satisfies all constitutional due process requirements for the exercise of specific personal jurisdiction by this Court.

8. Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §§ 1391(b)(1) and (c)(2) because Defendant's principal place of business is in this district and Defendant therefore resides in this district.

**PARTIES**

9.      Plaintiff Sally Orr ("Plaintiff") is, and at all times relevant to this complaint has been, a citizen of California residing and located within the Central District of California.   Plaintiff maintains reasonable expectations of privacy when browsing websites. Defendant systematically violated these expectations through its unauthorized surveillance activities.

10.      Defendant is a Delaware corporation that owns, operates, and/or controls https://www.sunoco.com/ (the "Website").  Through the Website, Defendant provides customers a software suite and platform including automated payroll and tax services, human resources and compliance management, time and attendance tracking, and recruiting and onboarding tools.

11.      Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

12.      Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein.  Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

**FACTUAL ALLEGATIONS**

13.      Defendant is the proprietor and operator of the Website.

14.      The Website, like most other websites, can determine the approximate geolocation of its visitors once the visitors request to visit the Website from their devices.  On information and belief, Defendant and the Website can geolocate visitors based on information obtained from their devices

3

as part of visiting the Website, such, for example, a visitor's IP address. The unlawful surveillance alleged herein collects information to identify every Website visitor well beyond an IP address.

15.    Defendant has partnered with registered California Data Brokers in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors (the "Data Brokers," and each a "Data Broker"). Defendant has done this by installing at least one Data Broker Software Development Kit ("DB-SDK") on the Website.

16.    DB-SDKs are designed to track and correlate visitors by capturing electronic impulses designed to identify them. This is accomplished through "browser fingerprinting," a process by which Data Brokers are able to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including a user's geolocation data, device information, persistent IDs, referrer data, identification and cross-referencing of malicious cookies installed on their devices and other traits evident from a user's browser.

### Registered California Data Brokers

17.    Data Brokers are companies whose core business is to collect, aggregate, analyze, and sell or license personal and non-personal data about individuals and organizations. Data Brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

18.    Data Brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

19.    Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and

4

linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

20.     Data Brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a Data Broker recently described the extent of their surveillance abilities as to an otherwise anonymous individual:

> We know who she is, what she watches, what she reads, and who she lives with.  [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys.  We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation.[1]

21.     Given the amount of data available by way of the Data Brokers' practices, a company like Defendant has an incentive to partner with a Data Broker so that it can learn the identity of visitors to its website in order to harass those visitors with unwanted and targeted solicitations.

22.     Defendant has in fact partnered with the Data Broker mentioned herein, by installing software on the Website in order to deanonymize, identify and target prospective customers, while allowing the Data Broker to access, use, and monetize the data provided by Defendant, in manners that are never shared with anyone outside of their organizations who does not purchase it.

---

[1] Lucas Ropek, Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users, March 15 2025 (Gizmodo.com), attached to the Complaint as **Exhibit A**.

**Defendant and California Data Brokers**

23.     Defendant's installation and use of a DB-SDK violates the California Penal Code § 638.51 ("the Trap and Trace law").

24.     Specifically, Defendant has installed the DB-SDK of LiveRamp (the "LiveRamp DB-SDK") on its Website.

25.     The LiveRamp DB-SDK turns anonymous web traffic into identifiable leads by identifying people and accounts.

26.      LiveRamp is one of the largest data brokers in California, specializing in deanonymization of website users. The LIVERAMP DB-SDK tracks online signals from a website visit and matches it with their vast database to create a universal serial number for a person called a "RampID."  The LIVERAMP DB-SDK functions as follows:

   a. First, when the LIVERAMP DB-SDK loads on a webpage, it immediately captures the user's identifiers present in that context – e.g. reading any first-party cookie ID or a platform's ID that the page passes, as well as standard header info like IP and user-agent.

   b. Second, the data obtained by the LIVERAMP DB-SDK is sent to LiveRamp's servers where LiveRamp combines the data obtained from a visit to Defendant's website with other data it has obtained about the individual both online and offline.  This data includes name and postal address, email address, cookie IDs, and mobile device IDs.

   c. Third, through this process, the user is matched with their pre-existing "RampID" (data broker serial number).  LiveRamp's RampID is permanent and designed to persistently track an individual across thousands of websites.

6

RampIDs do not change with clearing cookies or switching devices. The RampID, and the data associated with it, is widely shared with dozens of ad tech partners so that all parties who pay for it can identify the user and see the user's online habits.

27.    Visitors to the Website do not and cannot meaningfully consent to this identification. The tracking described herein is performed by a third-party and occurs by default. Visitors to Defendant's Website are not made aware of, and are not able to disable, this tracking and identification. The tracking described herein also occurs immediately upon the page loading making prior-consent impossible for Defendant to obtain.

**Plaintiff Was Subjected to a Trap and Trace Device on the Website**

28.    Plaintiff visited the Website on April 3, 2025, while in California. When Plaintiff did so Plaintiff's identifying information was sent to Data Brokers including LiveRamp by way of electronic impulses.

29.    The purpose of this transfer of data from Defendant to the Data Broker was for de-anonymization, profiling, targeting and ongoing browsing tracking (as described, *supra*). The transfer benefitted both Defendant and the Data Broker financially.

30.    The Data Broker took Plaintiff's information when Plaintiff visited the Website and added the information to its profiles of Plaintiff.   Defendant in turn received other relevant data obtained by the Data Broker regarding Plaintiff from other sources. The Data Broker could then use the information regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies.

31.    In this regard, a recent report by the Brennan Center, a public policy nonprofit, has

explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[2]  There are recent examples of tech companies exchanging information with the federal government in ways that threaten harm to women's freedom, minority viewpoints and marginalized United States citizens or residents.  For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[3]  Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[4]

32.     The prospect of private entities such as Data Brokers sharing data they have collected and organized into individualized profiles with government entities has increased significantly in 2025.  Columbia and Brown Universities recently agreed to turn over data about applicants and students, such as their race, grades and standardized test scores to the federal government.[5]  During the current administration, tech companies have complied with unprecedented demands for concessions from the federal executive branch.[6]  Further, the current federal administration has

---

[2] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole, attached to the Complaint as **Exhibit B**.

[3] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/, attached to the Complaint as **Exhibit C**.

[4] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185, attached to the Complaint as **Exhibit D**.

[5] *See, e.g.,* Sharon Otterman & Anemona Hartocollis, "Columbia and Brown to Disclose Admissions and Race Data in Trump Deal," (New York Times Aug. 6, 2025), found at https://www.nytimes.com/2025/08/05/nyregion/columbia-brown-admissions-trump.html, attached to the Complaint as **Exhibit E**.

[6] *See, e.g.,* Rob Wile & Allan Smith, "The CEO in chief: How Trump is getting what he wants from big business," (NBCNews.com Aug. 14, 2025), found at https://www.nbcnews.com/business/business-news/what-trump-involvement-major-corporations-means-us-politics-business-rcna224630, attached to the Complaint as **Exhibit F**.

threatened retaliatory action against pharmaceutical companies that refuse to comply with demands to lower drug prices.[7]  Although state and federal Trap and Trace laws prohibit the collection of such information, no clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government once it has been collected.

33.     The only purpose of the LiveRamp DB-SDK is to identify users.

34.     The LiveRamp DB-SDK meets the definition of a "trap and trace device" under Cal. Penal Code § 638.50(c) because the LiveRamp processes captures signaling information (who the visitor is and what the visitor is doing) in order to identify the source of an otherwise anonymous website visit through the electronic communications involved in using the internet.

35.     There is no way for Plaintiff to learn what the Data Broker did with Plaintiff's data, including what inferences the Data Broker has gleaned from it, or when, why and to whom the Data Broker has sold or licensed Plaintiff's data.  As such, Plaintiff has been injured by Defendant's surveillance practices.

36.     Plaintiff was never informed of, and therefore could not have consented to, data collection by the Data Broker for mercantile purposes.  Plaintiff has no way to know the scope of the injury suffered because the Data Brokers operate in secret and without public disclosure of their operations.

**The LiveRamp DB-SDK is a Trap and Trace Device.**

37.     CIPA defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

---

[7] *See, e.g.,* Anna Bratulic, "In latest Trump salvo, pharma giants face 60-day ultimatum on price cuts," (First Word Pharma, July 31, 2025), found at https://firstwordpharma.com/story/5985417, attached to the Complaint as **Exhibit G**.

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

38. The LiveRamp DB-SDK is a process to identify the source of electronic communication by capturing electronic impulses sent out from Website users' devices and identifying dialing, routing, addressing, and signaling information about or generated by the users. The users are never informed that the Website is collaborating with the Data Broker to obtain their phone numbers and other identifying information.

39. The LiveRamp DB-SDK is "reasonably likely" to identify the source of electronic impulses sent from devices visiting the Website. In fact, DB-SDKs like the LiveRamp DB-SDK are designed solely to meet this objective.

40. Defendant did not obtain a court order before installing or using the LiveRamp DB-SDK on its Website.

41. Defendant did not obtain the express or implied consent of Plaintiff to be subjected to data sharing with LiveRamp for the purposes of de-anonymization, profiling, and targeting.

42. Defendant is statutorily ineligible to assert consent as a defense to its illegal use of a Trap and Trace device. Under Penal Code § 638.51(b), a consent defense is only available to a "provider of electronic or wire communication service," which Defendant is not.

43. The California Invasion of Privacy Act ("CIPA"), California Penal Code § 630 *et seq.*, imposes civil liability and provides for statutory damages for the installation and use of trap and trace software without a court order. *Id.* §§ 637.2, 638.51; *see Moody v. C2 Educ. Sys. Inc.*, No. 2:24-CV-04249-RGK-SK, 2024 WL 3561367 (C.D. Cal. July 25, 2024) (holding that data broker software was properly alleged to be a trap and trace device because it communicates over the internet and the

10

statutory definition of a trap and trace device expressly covers "wire communication" and "electronic communication," and is not limited to telephone lines).

**CLASS ACTION ALLEGATIONS**

44.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

45.     Plaintiff brings this action individually and on behalf of all others similarly situation (the "Class") defined as follows:

> **All persons within California whose identifying information was sent**
>
> **to a registered California Data Broker as a result of visiting**
>
> **https://sunoco.com.**

46.     NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not greater.  The exact identities of Class Members may be ascertained by the records maintained by Defendant.

47.     COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class.  Such common legal and factual questions, which do not vary between Class Members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

    a.  Whether the LiveRamp DB-SDK is a trap and trace process as defined by California law;

    b.  Whether Plaintiff and Class Members are entitled to statutory damages;

    c.  Whether Plaintiff Class Members are entitled to injunctive relief;

    d.  Whether Plaintiff and Class Members are entitled to nominal damages; and

e. Whether Class Members are entitled to disgorgement of unlawfully obtained data.

48. TYPICALITY: As a person who visited Defendant's Website and whose personal information was fingerprinted and de-anonymized by LiveRamp, Plaintiff is asserting claims that are typical of the Class.

49. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in the class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper can be excluded.

50. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class Member is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

51. Defendant's actions inflicted direct and tangible harm upon Plaintiff and Class Members which is concrete and not speculative. An individual's data constitutes a form of personal property that was located on Plaintiff's own device, and Defendant effectively stole this property. The detailed digital profile that Defendant assembled possesses a quantifiable market value, with estimates ranging from $0.10 to $0.50 for a basic consumer profile and exceeding $5.00 for a B2B prospect interested in high-value professional services. Defendant misappropriated this valuable asset for its own commercial enrichment. Defendant accomplished this by intentionally through sending electronic code to Plaintiff's device that extracted personal information about Plaintiff from that device and transmitted that information to LiveRamp. This extraction from Plaintiff's device and

transmission to LiveRamp further prevented and interfered with Plaintiff's ability and right to own the data on her own device and control where it would be sent it and how would be used.

52.    Most importantly, Plaintiff and the Class were harmed because the information was used to fingerprint and identify the needle of an individual's visit from the haystack of all other anonymous internet traffic. Defendant and LiveRamp had no right to attempt to uncover and disclose anything about Plaintiff or Class Members' anonymous visits to Defendant's Website, much less transmit personal information to LiveRamp and essentially forcing Plaintiff and Class Members to do business with a registered Data Broker. This information was not for sale.

## FIRST CAUSE OF ACTION

### Violations of California Penal Code § 638.51

### (The "California Trap and Trace Law")

53.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

54.    The California Trap and Trace Law provides that "a person may not install or use…a trap and trace device without first obtaining a court order…." Cal. Penal Code § 638.51(a).

55.    A "trap and trace device" is defined as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.* § 638.50(c).

56.    The LiveRamp DB-SDK, as deployed on the Website, constitutes a trap and trace device under Cal. Penal Code § 638.50(c). It is designed to identify the source of the electronic and wire communications sent from the devices of users in California visiting the Website, in violation of the California Trap and Trace Law.

57.     Defendant did not obtain a court order before using or installing the LiveRamp DB-SDK on the Website.  Defendant also did not obtain consent from Plaintiff or any of the Class Members before using trap and trace technology, including the LiveRamp DB-SDK, to identify visitors to its Website.

58.     CIPA imposes civil liability including allowing injured individuals to recover the greater of $5,000 in statutory damages or three times their actual damages, if any, for each violation of the California Trap and Trace Law. Cal. Penal Code § 637.2; *see also C2 Educ. Sys. Inc.*, 2024 WL 3561367.

## PRAYER

WHEREFORE, Plaintiff prays for the following relief against Defendant:

1.     An order certifying the Class, naming Plaintiff as the representative of the Class and Plaintiff's attorneys as Class Counsel;

2.     An order requiring the disgorgement of data unlawfully obtained by Defendant's deployment of a trap and trace device;

3.     An order enjoining Defendant's conduct as alleged herein and any other injunctive relief that the Court finds proper;

4.     Statutory damages pursuant to CIPA;

5.     Punitive damages;

6.     Nominal damages;

7.     Reasonable attorneys' fees and costs; and

8.     All other relief that would be just and proper as a matter of law or equity, as determined by the Court.

## REQUEST FOR JURY TRIAL

Plaintiff requests a trial by jury on all claims so triable.

Respectfully submitted,

SALLY ORR

By Her Attorneys,

TAULER SMITH

Dated:  November 6, 2025

*/s/Robert Tauler*
Robert Tauler, Esq. (#24122095)

*/s/Camrie Ventry*
Camrie Ventry, Esq. (#24126131)

15